UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROBERT ANDING AND ROBERTA ANDING, | § | No. 1:22-CV-01039-DAE |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| THE CITY OF AUSTIN, | § | |
| | § | |
| Defendant. | § | |
| | § | |

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court are competing Motions for Summary Judgment, both filed on May 3, 2023. (Dkts. ## 66, 67.) The first was filed by Defendant City of Austin ("the City"), and the second was filed by Plaintiffs Robert and Roberta Anding ("the Andings"). The parties filed Responses in Opposition on May 17, 2023, and both filed Replies on May 24, 2023. (Dkts. ## 68, 69, 70, 71.) The Andings filed a Sur-reply on July 3, 2023. (Dkt. # 73.) The City filed a Response to the Andings' Sur-reply on July 20, 2023. (Dkt. # 74.)

The Court held a hearing on this matter on July 25, 2023. After careful consideration, for the reasons that follow, the Court **DENIES** the City's Motion for Summary Judgment (Dkt. # 66) and **GRANTS** the Andings' Motion for Summary Judgment. (Dkt. # 67.)

PROCEDURAL BACKGROUND

The Court incorporates the discussion of this case's factual background from the February 16, 2023 Order (the "February Order") on the City's Motion to Dismiss.  (Dkt. # 41.)  To briefly summarize this case's procedural background, on October 14, 2022, the Andings filed suit against the City of Austin, alleging that its 2016 short-term rental ordinance (the "STR Ordinance") is unconstitutional both facially and as applied to the Andings.  (Dkt. # 1.)  The Andings filed a joint Motion for Temporary Restraining Order and Motion for Preliminary Injunction on October 18, 2022.  (Dkt. # 4.)  On December 5, 2022, the Andings amended their Complaint to join Joseph and Jennifer Hebert (the "Heberts") as plaintiffs.  (Dkt. # 25.)

The City filed a Motion to Dismiss the Amended Complaint on December 19, 2022.  (Dkt. # 33.)  This Court ruled on the Motion on February 16, 2023, dismissing the Heberts from the case and dismissing the Andings' dormant Commerce Clause and federal and state equal protection claims.  (Dkt. # 41.)  After the Court issued the February Order, the Andings requested leave to file a Second Amended Complaint (the "SAC"), to allege facts curing the jurisdictional defects identified by the Court.  (Dkt. # 42.)  The Court granted the Andings' Motion for Leave to Amend on February 21, 2023, and the Andings filed the SAC the same day.  (Dkts. ## 44, 45.)  Shortly after, the Andings filed an Amended

2

Motion for Preliminary Injunction and Temporary Restraining Order.  (Dkt. # 46.)
The City filed a Motion to Dismiss the SAC on March 7, 2023.  (Dkt. # 48.)

At a hearing on April 12, 2023, the Court orally dismissed without
prejudice the Andings' Motion for Preliminary Injunction and Temporary
Restraining Order as well as the City's Motion to Dismiss the SAC.  (Dkt. # 64.)
The Court ordered the parties to file Motions for Summary Judgment by May 3,
2023, with a hearing date set for July 25, 2023.  (Dkt. # 65.)

At the hearing, the parties argued the merits of their cross-Motions for
Summary Judgment.  The Court expands upon these arguments below.

<u>LEGAL STANDARD</u>

"Summary judgment is appropriate only if there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."
<u>Vann v. City of Southaven</u>, 884 F.3d 307, 309 (5th Cir. 2018) (quotations omitted);
<u>see</u> <u>also</u> FED. R. CIV. P. 56(a).  "A genuine dispute of material fact exists when the
'evidence is such that a reasonable jury could return a verdict for the nonmoving
party.'"  <u>Bennett v. Hartford Ins. Co. of Midwest</u>, 890 F.3d 597, 604
(5th Cir. 2018) (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986)).

"Where the non-movant bears the burden of proof at trial, the movant
may merely point to the absence of evidence and thereby shift to the non-movant
the burden of demonstrating . . . that there is an issue of material fact warranting

trial." <u>Nola Spice Designs, LLC v. Haydel Enter., Inc.</u>, 783 F.3d 527, 536 (5th Cir. 2015) (quotations omitted).  "When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." <u>Duffie v. United States</u>, 600 F.3d 362, 371 (5th Cir. 2010).  Instead, the non-movant must identify specific evidence in the record and articulate how that evidence supports the party's claim.  <u>Willis v. Cleco Corp.</u>, 749 F.3d 314, 317 (5th Cir. 2014)).

At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Lee v. Offshore Logistical & Transp., LLC</u>, 859 F.3d 353, 355 (5th Cir. 2017).  The court draws all reasonable inferences in the light most favorable to the nonmoving party.  <u>Wease v. Ocwen Loan Servicing, LLC</u>, 915 F.3d 987, 992 (5th Cir. 2019).  However, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." <u>United States v. Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012).

<u>DISCUSSION</u>

Following the February Order and the Andings' SAC, the claims remaining in this case are as follows: (1) a dormant Commerce Clause claim; (2) a

state unconstitutional retroactivity claim; and (3) state and federal substantive due process claims.[1]  Both parties move for summary judgment of all claims.

The Andings' claims are premised on the City's refusal to issue them a Type 2 STR license following the decision in Zaatari v. City of Austin, 615 S.W.3d 172, 180-90 (Tex. App. – Austin 2019, pet. denied).  The Andings also challenge the STR Ordinance's homestead requirement, which dictates that owners of properties within certain zoning districts[2] – including the one where the Andings' home is located – may only receive a short-term rental license if the owner resides on the premises.  See AUSTIN, TEX., LAND DEV. CODE § 25-2-289. The Andings allege this requirement is unconstitutional both facially and as applied to them.  (Dkt. # 1.)

I.   Preclusive Effect of Zaatari

The Court first considers the Andings' argument that Zaatari precludes the City from relitigating the issue of whether nonresident owners of STRs pose unique harms to Austin's neighborhoods and public safety.  (Dkt. # 67 at 8.)  "Texas [state] law, not federal law, applies when a federal court determines

---

[1] The Andings also included state and federal equal protection claims in the SAC, which the Court already dismissed in the February Order.  The Court addresses this issue below.

[2] The City stated at the hearing that Type 2 licenses are only allowed in seven districts, most of which are commercial rather than residential areas.

the preclusive effect of a Texas judgment." <u>Harmon v. Dall. Cty, Tex.</u>, 927 F.3d 884, 890 (5th Cir. 2019).  Under Texas law, collateral estoppel precludes a party from litigating an issue if (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.  <u>Johnston v. Am. Med. Intern.</u>, 36 S.W.3d 572, 576 (Tex. App. – Tyler, 2000, pet. denied).

The Court begins with the third element, as it appears most heavily disputed.  To meet the requirement that "the parties were cast as adversaries in the first action," the moving party need not demonstrate strict mutuality of the parties. <u>Id.</u>  Rather, Texas law instructs that it is "only necessary that the party against whom the doctrine is asserted was a party or in privity with a party in the first action."  <u>Id.</u> (citing <u>Neely v. Comm'n for Lawyer Discipline</u>, 976 S.W.2d 824, 827 (Tex. App. – Houston [1st Dist.] 1998, no writ)).  Thus, though the Andings were not parties to <u>Zaatari</u>, the Court may still permit them to use "offensive" collateral estoppel because the City was in fact a party to <u>Zaatari</u>.  <u>Fletcher v. Nat'l Bank of Commerce</u>, 825 S.W.2d 176, 177 (Tex. App. – Amarillo, 1992, no pet.) (explaining that the offensive use of collateral estoppel occurs when a plaintiff seeks to estop a defendant from relitigating an issue in which the defendant previously litigated and lost in a suit involving another party).  However, Texas

courts generally suggest that the trial judge decline to apply offensive collateral

estoppel "in cases where a plaintiff could easily have joined in the earlier action or

where . . . the application of offensive estoppel would be unfair to a defendant."

Brown v. Freed, No. 3-21-556, 2023 WL 3325938, at *5 (Tex. App. – Austin,

2023, no pet.) (citing Parklane Hosiery v. Shore, 439 U.S. 322, 331 (1979)).

      As a refresher, in Zaatari, the court considered a different, now non-

existent, section of the STR Ordinance: § 25-2-950, which terminated all Type 2

STRs[3] outside of a few select zoning areas by April 2022.  615 S.W.3d at 188.  In

determining that the law was unconstitutionally retroactive under the Texas

constitution, the court assessed "the nature and strength of the public interest

served by the statute as evidenced by the Legislature's factual findings."  Id. at 189

(citing Robinson v. Crown Cork & Seal Co., Inc., 335 S.W.3d 126, 145 (Tex.

2010)).  The City argued that the regulations addressed public-health concerns

related to sewage, fire hazards, and "bad actor" tenants who dump trash in the

neighborhoods; public-safety concerns about strangers to neighborhoods, public

intoxication, and open drug use; general-welfare concerns about noise, loud music,

vulgarity, and illegal parking; and the negative impact on historic Austin

---

[3] In other words, this section eliminated Type 2 licenses even for property owners
occupying the home.

neighborhoods, specifically the alteration of neighborhood quality of life and affordability.  Id.

The court found that "nothing in the record . . . show[ed] that any of these stated concerns is specific or limited to type-2 short-term rentals . . . . [m]ore importantly, nothing in the record supports a conclusion that a ban on type-2 rentals would resolve or prevent the stated concerns."  Id.  The court emphasized that many of the City's concerns "can be and already are prohibited by state law" and that there was no evidence, not even a history of citations to licensed short-term rental owners, to support a compelling interest in such a prohibition.  Id. at 190.  Accordingly, the City was ordered to remove § 25-2-950 from the City Code.

The City now asserts that Zaatari does not require the City to issue *new* licenses for Type 2 STRs located in zoning districts outside those expressly permitted.  (Dkt. # 45 at 11.)  This means that homeowners like the Andings, who purchased a Type 2 property in a zoning district that permitted Type 2 STRs prior to the enactment of the STR Ordinance, are permanently barred from operating an STR in that property as long as they are non-occupying owners.[4]  The City recites

---

[4] The City Code does not define "owner-occupied," but the parties agree that the Andings are "non-occupying owners" of their property.  In his declaration, Daniel Word, the acting director for the City of Austin Code Department, asserts that owner-occupied status is determined through a multi-factor analysis, looking at data points such as the type of insurance policy owned, homestead status, voter registration, vehicle registration, driver's license information, and other publicly available information.  (Dkt. # 66-1 at 3.)

nearly the same justifications for its refusal to issue new licenses as it did for

sunsetting existing ones in <u>Zaatari</u>.  (Dkts. # 66-1 at 4 (the declaration of the acting

director of the City of Austin Code Department describing concerns about the

housing shortage, trash, fire, and public intoxication hazards, and "bad actor"

tenants); 66-3 (a Note written by a Harvard Law student on the way short-term

rentals exacerbate the affordable housing crisis in Los Angeles); 66-4 at 68

(transcript of a City Council session where members discuss amendments to the

STR Ordinance); 66-5 (an article on land use policy and the benefits of regulating

urban vacation rentals).)

   Given the substantial similarities between the evidence and

justifications proffered by the City, the Court is loath to relitigate an issue already

considered by the state court – particularly one with such a sweeping effect on

Austin's zoning scheme.  And as for the City's arguments against offensive

collateral estoppel, even if the Andings could have joined <u>Zaatari</u>, the holding

applies broadly to the STR Ordinance and all affected by it.  <u>See</u> <u>Zaatari</u>, 615

S.W.3d at 189-90.  In other words, this is not a case where the Andings unfairly

played a game of "wait and see" to take advantage of another litigant's individual

win.  As in <u>Parkland Hosiery</u>, "there is no unfairness to the [City] in applying

offensive collateral estoppel . . . . in light of . . . the foreseeability of subsequent

private suits that typically follow a successful Government judgment."  439 U.S. at 332.

In summary, the Court finds the application of offensive collateral estoppel appropriate.  <u>Zaatari</u>'s determination that non-resident STR owners pose no unique harms to the city was fully litigated and essential to the court's judgment, and the City was a party to that case.  Because there is no inherent unfairness in permitting the Andings to raise the defense of collateral estoppel, the Court agrees that the City may not re-litigate the issue of whether non-resident STR pose unique harms here.

II.     <u>Dormant Commerce Clause</u>

The Court next turns to the Andings' dormant Commerce Clause claim.  The City alleges that the Andings have neither Article III nor prudential standing to raise such a claim, and even if they did, the claim would fail on the merits.  (Dkt. # 66 at 3-10.)  The Andings insist that they do have standing, and that summary judgment of this claim is warranted under <u>Hignell-Stark v. City of New Orleans</u>, 46 F.4th 317, 326 (5th Cir. 2022).  (Dkt. # 67 at 10.)

a.  <u>Standing</u>

The Court already determined that the Andings have Article III standing for their dormant Commerce Clause claim.  (<u>Id.</u> at 18 ("The Andings are unable to rent out their home for periods less than 30 days because of the STR

Ordinance and the City's refusal to issue Type 2 licenses.  Thus, their loss of

income is traceable . . . and would be remedied if the Court rules that the STR

Ordinance is unconstitutional.").)  Accordingly, the Court will not rehash this

issue.

However, when considering the First Amended Complaint, the Court

found that the Andings lacked prudential standing to raise a dormant Commerce

Clause claim.  (Dkt. # 41 at 22.)  The Court determined that the STR Ordinance

indeed facially discriminates against out-of-state economic interests, but that no

such interest was implicated by the Andings' alleged injury because their business

is "purely intrastate, and they have no contracts that are negotiated on a national or

interstate basis."  (Id. (citing Cibolo Waste, Inc. v. City of San Antonio, 718 F.3d

469, 474 (5th Cir. 2013).)  In the SAC, the Andings now contend that "[t]heir

home, when rented, has always been marketed, negotiated, [and] leased out

nationally."  (Dkt. # 45 at 8.)  The Andings specify the home states of the tenants

to whom they have marketed, negotiated, or leased, and state that they "fully

intend and actively desire to open up their home to tenants from all over the U.S.

on a short-term basis."  (Id.)

The Fifth Circuit employs a disjunctive test to determine whether a

claim under the dormant Commerce Clause falls within the zone of interests,

asking: (1) whether Plaintiffs "have standing to challenge [the ordinance] as

facially discriminatory against out-of-state economic interests," or (2) whether Plaintiffs "can merely challenge the ordinance[] as being excessively burdensome to interstate commerce." Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Ass'n, 389 F.3d 491, 499 (5th Cir. 2004). Because the Andings maintain that they have standing to assert both types of claims, the Court analyzes each.

      i.   Prudential Standing to Challenge the STR Ordinance as Facially Discriminatory

First, the Court finds that the Andings have prudential standing to raise a facial discrimination claim under the dormant Commerce Clause. The City's reliance on Pine Belt for the proposition that "merely engaging in interstate commerce is not enough to have standing to bring a facial discrimination claim" is misplaced. (Dkt. # 66 at 5.) In Pine Belt, the Fifth Circuit clarified that even though the ordinance at issue impacted interstate commerce, the plaintiffs themselves did not engage in the out-of-state activity regulated by the ordinance, and thus did not have standing to challenge the ordinance as facially discriminatory against out-of-state interests. 389 F.3d at 499-500 ("[T]hese plaintiffs do not ship (and, so far as the record shows, have never shipped) *any* waste they collect within the Region to any location outside of Mississippi . . . and have not even alleged that they have any plans to do so . . . . In sum, plaintiffs' injury is not related to any out-of-state characteristic of their business."). The Court did not, as the City seems

12

to suggest, impose an out-of-state residency requirement for raising a dormant Commerce Clause claim.[5]  (Dkt. # 66 at 6.)

        The City also points to the Supreme Court's recent decision in <u>Nat'l Pork Producers Council v. Ross</u>, 143 S. Ct. 1142 (2023) in support of its contention that the Andings lack prudential standing.  (Dkt. # 71 at 4-5.)  In <u>Pork Producers</u>, the plaintiffs challenged a California proposition prohibiting the in-state sale of meat from pigs confined in a cruel manner.  143 S. Ct. at 1150.  The Court determined that the law did "not implicate the antidiscrimination principle at the core of the Court's dormant Commerce Clause cases" because it treated in-state and out-of-state commerce alike.  <u>Id.</u> at 1153.  Thus, the plaintiffs attempted to argue that Supreme Court precedent suggested the existence of an "almost *per se*" rule forbidding enforcement of state laws that have the "practical effect of controlling commerce outside the State," even when those laws do not purposely discriminate against out-of-state economic interests.  <u>Id.</u> at 1153-54.  The Court rejected this theory.

---

[5] In fact, the other case the City proffers for this proposition, <u>General Motors Corp. v. Tracy</u>, 519 U.S. 278, 286 (1997), is inapposite.  There, the Court addressed only Article III standing, not prudential standing, and stated that "cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates."  <u>Id.</u>  The Court also pointed to a string of cases where it held that in-state plaintiffs had standing to challenge state regulations primarily targeted at out-of-state conduct.  <u>Id.</u> at 287.  The City appears to rely on the Supreme Court's discussion of the Ohio Supreme Court's ruling on standing, which was promptly reversed.

The Pork Producers plaintiffs then retreated to a second argument that the proposition's burden to interstate commerce was clearly excessive in relation to the putative local benefits, following the balancing test from Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).  In rejecting this theory, the Court noted that there is "no clear line" separating the Pike line of cases from those dealing with facial discrimination.  Pork Producers, 143 S. Ct. at 1157.  The Court emphasized that even when a statute or regulation is not facially discriminatory, the Pike test "serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose."  Id.  The California regulation was "well outside Pike's heartland" and thus the Court refused to "read Pike as authorizing judges to strike down duly enacted state laws regulating the in-state sale of ordinary consumer goods (like pork) based on nothing more than their own assessment of the relevant law's 'costs' and 'benefits.'"  Id. at 1159.

The City suggests, perhaps correctly, that Pork Products may render the Fifth Circuit's disjunctive test for dormant Commerce Clause prudential standing obsolete.  (Dkt. # 71 at 4.)  However, nothing in Pork Products changes the outcome of this Court's standing analysis.  The STR Ordinance here facially discriminates against out-of-state commerce.  (See Dkt. # 41 at 20.)  Thus, the Court applies the *per se* invalid test, not the Pike test.  Accordingly, the Court finds

no reason why either holding of Pork Products is relevant to the standing analysis in this case.

Returning to the merits of whether the Andings have prudential standing, the SAC provides ample evidence of the Andings' engagement in interstate commerce and how the STR Ordinance stifles these interstate activities. (Dkt. # 45 at 8.)  Contrary to the City's urging, there is no requirement that a plaintiff must be an out-of-state resident in order to contest a law as discriminating against interstate commerce.  The Andings' allegations that they rent, market, and negotiate nationwide suffice to create prudential standing for a facial discrimination claim under the dormant Commerce Clause.

ii.  Prudential Standing to Challenge the STR Ordinance as Excessively Burdening Interstate Commerce

Standing to raise an excessive burden claim similarly requires a showing that the plaintiff "is engaged in interstate commerce and [that] *their* interstate commerce is burdened by the ordinance."[6]  Cibolo Waste, 718 F.3d at 475 (citing Pine Belt, 389 F.3d at 500-01).  For the same reasons described above, the Andings meet this requirement.  Accordingly, the Andings have prudential

---

[6] The Court proceeds with the disjunctive analysis, though it may be obsolete after Pork Producers, given that the Fifth Circuit has yet to weigh in on its effect.  The outcome is the same regardless.

standing to raise their dormant Commerce Clause claim under either prong of the

Fifth Circuit's disjunctive test.

     b.  <u>Merits of Dormant Commerce Clause Claim</u>

       Having established that the Andings possess standing to raise their

dormant Commerce Clause claim, the Court next turns to the merits.  The Andings

argue that <u>Hignell-Stark</u> governs the outcome of this issue, whereas the City

contends that the STR Ordinance is not motivated by economic protectionism and

thus passes both the <u>Hignell-Stark</u> test and the <u>Pike</u> balancing test.  (Dkts. ## 67 at

10; 66 at 8.)  The Court begins by taking a closer look at <u>Hignell-Stark</u> and its

applicability to the Andings' claims.

       In <u>Hignell-Stark</u>, the Fifth Circuit considered a substantially similar

STR ordinance in New Orleans.  46 F.4th at 321.  As relevant here, the plaintiffs

made a dormant Commerce Clause challenge to the ordinance's provision, which

stated that no person could obtain an STR license in a residential neighborhood

unless the property was also the owner's primary residence.  <u>Id.</u>  The Fifth Circuit

held that the homestead requirement facially discriminated against interstate

commerce, and was thus *per se* invalid unless New Orleans could prove that it

"advances a legitimate local purpose that cannot be adequately served by

reasonable nondiscriminatory alternatives."  <u>Id.</u> at 328 (citing <u>Dep't of Revenue of</u>

<u>Ky. v. Davis</u>, 553 U.S. 328, 338 (2008)).[7]  The court further determined that New Orleans' proffered interests – preventing nuisances, promoting affordable housing, and protecting the residential character of neighborhoods – could adequately be served by reasonable nondiscriminatory alternatives.  <u>Id.</u>  Thus, the Fifth Circuit invalidated the ordinance as unconstitutional.  <u>Id.</u> at 329.

Likewise, the Court will first consider whether the STR Ordinance facially discriminates against interstate commerce, thus invoking either the *per se* rule or the <u>Pike</u> test, and then will apply the relevant standard.

### i. Facial Discrimination

This Court determined in its February Order that the homestead requirement of the STR Ordinance facially discriminates against interstate commerce.  (Dkt. # 41 at 20); <u>see also</u> <u>Hignell-Stark</u>, 46 F.4th at 326 ("[t]he residency requirement discriminates on its face against out-of-state property owners. The City doesn't just make it more difficult for them to compete in the market for STRs . . . it forbids them from participating altogether.").  However, the Court will elaborate upon this holding, considering the parties' arguments below.

---

[7] The Fifth Circuit clarified that "[i]f a law discriminates against interstate commerce, it is in big trouble because '[a] discriminatory law is virtually *per se* invalid.'"  <u>Id.</u> at 325 (citing <u>Davis</u>, 553 U.S. at 338).  By contrast, if a law imposes merely an incidental burden on interstate commerce, the <u>Pike</u> balancing test applies.  <u>Id.</u>  Under <u>Pike</u>'s more relaxed standard, the law will be upheld unless "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits."  <u>Pike</u>, 397 U.S. at 142.

First, <u>Hignell-Stark</u> provides binding authority for this conclusion.  In determining that the residency requirement in the nearly identical New Orleans STR Ordinance facially discriminated against out-of-state property owners, the Fifth Circuit addressed New Orleans' arguments that (1) the purpose of the residency requirement was not to protect residents from interstate competition, but to address nuisances created by STRs by ensuring that an adult lived on the property full-time; (2) out-of-staters could still own STRs in nonresidential neighborhoods; and (3) the residency requirement discriminated against other Louisianans, not just out-of-staters.  <u>Id.</u> at 327.  The City makes the same arguments in support of the Austin STR Ordinance.

As the court in <u>Hignell-Stark</u> stated, even if the City's justifications are true, the "purpose of, or justification for, a law has no bearing on whether it is facially discriminatory."  <u>Id.</u> (quoting <u>Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.</u>, 511 U.S. 93, 100 (1994)).  Indeed, "the dormant Commerce Clause prohibits more than laws with protectionist purposes.  It also prohibits laws that discriminate against interstate commerce on their face."  <u>Id.</u> (quoting <u>Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n</u>, 945 F.3d 206, 213 (5th Cir. 2019)).  "[E]ven if the residency requirement merely imposes a discriminatory burden on interstate commerce, it still qualifies as discriminatory."  <u>Id.</u>  And though the residency requirement discriminates against other Texans, "none of that

18

matters" because "local ordinances that discriminate against interstate commerce are not valid simply because they also discriminate against *intra*state commerce." Id. (emphasis added).

Though the City again attempts to draw a parallel to Pork Producers, its reliance is misplaced.  Notwithstanding the fact that this Court already made a facial discrimination ruling, the STR Ordinance is distinguishable from the proposition at issue in Pork Producers.  There, the regulation uniformly prohibited inhumane pork sales in an effort to eliminate animal cruelty; the law made no distinction between in-state and out-of-state products.  Pork Producers, 143 S. Ct. at 1150.  Here, the City attempts to argue that because everyone, including Austinites, are required to "occupy" the property rented under a Type 2 license, the law treats in-state and out-of-state residents the same.  (Dkt. # 71 at 5.)  The Court finds this characterization lacking.

Though true that in-state residents are bound by the same requirement as out-of-state residents, occupying a property in Austin necessarily requires residency in Austin.[8]  Thus, while not stated in express terms, the STR Ordinance discriminates against out-of-state as well as out-of-city citizens; the ban is hardly

---

[8] Though the City contends that an individual's "occupancy" status is determined by a number of factors, the fact that voter and vehicle registration and driver's license information are key considerations suggests that in-state residency is, at the very least, a significant factor.  (See Dkt. 66-1 at 3.)

uniform, as in <u>Pork Producers</u>.  Additionally, the STR Ordinance is clearly created

to benefit Austin residents at the expense of out-of-city residents, whether in-state

or out.  The very core of this prohibition, as the City itself admits, is to "promote

affordable housing and combat housing shortages," "allow families to stay in the

City," "reduce fire hazards, over-occupancy, loud music and other nuisances," and

"promote neighborhood quality of life."  (Dkt. # 66 at 10.)  Regardless of the

reasoning behind these motivations, the STR Ordinance indisputably discriminates

against out-of-state and out-of-city residents for the benefit of in-city residents on

its face.  See <u>Hignell-Stark</u>, 46 F.4th at 326 (noting that the "upshot" of the

requirement that an owner's primary residence be located on the same plot of

record as the STR "is that only residents of the City may enter the market for STRs

in residential neighborhoods.").

> ii. <u>Legitimate Local Purpose Not Adequately Served by
> Reasonable Nondiscriminatory Alternatives</u>

Accordingly, the STR Ordinance is *per se* invalid unless the City can

prove that it "advances a legitimate local purpose that cannot be adequately served

by reasonable nondiscriminatory alternatives."  <u>Id.</u> at 328 (citing <u>Dep't of Revenue</u>

<u>of Ky. v. Davis</u>, 553 U.S. 328, 338 (2008)).  First, the Court notes that collateral

estoppel does not apply to this claim.  The City contends that relitigating the issue

of harms posed by non-resident STR owners is not precluded because the City had

a "significantly heavier burden of persuasion" in <u>Zaatari</u> than here.[9]  (Dkt. # 68 at 4

(citing <u>Sysco Food Servs., Inc. v. Trapnell</u>, 890 S.W.3d 796, 802 (Tex. 1994)).)

The Court agrees.  In <u>Zaatari</u>, the City had to prove a "compelling public interest"

to overcome the presumption of retroactivity.  615 S.W.3d at 188.  Here, the City

must show that the STR Ordinance "advances a legitimate local purpose that

cannot be adequately served by reasonable nondiscriminatory alternatives."

<u>Hignell-Stark</u>, 46 F.4th at 328 (citing <u>Dep't of Revenue of Ky. v. Davis</u>, 553 U.S.

328, 338 (2008)).  The difference between these two burdens is enough to preclude

collateral estoppel in this claim.  <u>See</u> REST. 2D OF JUDG. §§ 28(4) (1982); <u>Scurlock</u>

<u>Oil Co. v. Smithwick</u>, 724 S.W.2d 1, 7 (Tex. 1986); <u>Felton v. Leake Cty. Sch.</u>

<u>Dist.</u>, No. 3:14-CV-411, 2015 WL 519062, at *4 (S.D. Miss. Sept. 7, 2015).  Thus,

the Court must consider, absent the application of collateral estoppel, whether the

STR Ordinance "advances a legitimate local purpose that cannot be adequately

served by reasonable nondiscriminatory alternatives."  <u>Hignell-Stark</u>, 46 F.4th at

328 (citing <u>Dep't of Revenue of Ky. v. Davis</u>, 553 U.S. 328, 338 (2008)).

   In <u>Hignell-Stark</u>, New Orleans offered three interests served by the

residency requirement: preventing nuisances, promoting affordable housing, and

protecting neighborhoods' residential character.  <u>Id.</u>  The City's interests largely

---

[9] However, the City concedes that collateral estoppel would apply to the
retroactivity claim because the burden of persuasion is the same as in <u>Zaatari</u>.
(Dkt. # 68 at 4.)

mirror those in <u>Hignell-Stark</u>, as the City purports to "promote affordable housing and combat housing shortages," "allow families to stay in the City," "reduce fire hazards, over-occupancy, loud music and other nuisances," and "promote neighborhood quality of life" through the STR Ordinance.  (Dkt. # 66 at 10.)  As the Fifth Circuit stated, "[t]here's no question that those are legitimate local purposes."  <u>Hignell-Stark</u>, 46 F.4th at 328.  However, "all of those objectives can adequately be served by reasonable nondiscriminatory alternatives, so none of them can justify the requirement."  <u>Id.</u>

   <u>Hignell-Stark</u> found that, as to the goal of promoting nuisances, New Orleans could "step up its enforcement efforts" and "increase the magnitude of penalties it imposes on owners for guests," or even "strip repeat offenders of their STR licenses."[10]  <u>Id.</u>  The Fifth Circuit also suggested "giv[ing] STR owners the alternative of having an operator stay on the property during the night."  <u>Id.</u>  The same could be said for the City of Austin in pursuit of its goal of "reduc[ing] fire hazards, over-occupancy, loud music and other nuisances" and "promot[ing]

---

[10] The Fifth Circuit also noted that New Orleans could increase taxes on STRs as a possibility for discouraging younger and rowdier guests from renting them.  <u>Id.</u>  The City argues that this option is not available to Austin because STRs are already taxed at the statutory maximum.  (Dkt. # 66 at 8.)  However, there are still ample alternatives available to the City.  <u>See</u> Hignell Stark, 46 F.4th at 329 (quoting <u>Dickerson v. Bailey</u>, 336 F.3d 388, 402 (5th Cir. 2003) ("[I]f there are '*any* available alternative methods for [achieving the government's] legitimate policy goals,' the residency requirement is invalid.")).

neighborhood quality of life." (Dkt. # 66 at 10.)  As for preserving affordable

housing, <u>Hignell-Stark</u> found that New Orleans could reduce the demand for

housing in other ways, such as increasing the price of an STR license,[11] capping

the number of licenses available in a particular neighborhood, or increasing the

available housing supply by eliminating price controls, reducing housing

regulations, and providing incentives for homebuilders to construct more housing.

<u>Id.</u>  Again, the City has given no indication that these are not "reasonable

nondiscriminatory alternatives."  <u>Id.</u>

      As the Fifth Circuit stated, "[t]he City has many options to address the

problems caused by STRs in residential neighborhoods.  But it chose one the

Constitution forbids."  <u>Id.</u> at 329.  Accordingly, the Court grants summary

judgment of the dormant Commerce Clause claim and finds that the STR

Ordinance's homestead requirement for Type 2 licenses is unconstitutional.

III.    <u>Unconstitutional Retroactivity</u>

      Even if the STR Ordinance's homestead requirement did not violate

the dormant Commerce Clause, it would still fail as unconstitutionally retroactive

---

[11] Again, the City's argument that license fees cannot be increased for STRs unless
the increase is necessary to cover regulatory costs is not dispositive because "if
there are '*any* available alternative methods for [achieving the government's]
legitimate policy goals,' the residency requirement is invalid."  <u>Id.</u> at 329 (quoting
<u>Dickerson</u>, 336 F.3d at 402)).

under Texas law.  The legal standard for unconstitutional retroactivity claims

articulated in the February Order bears repeating.  (Dkt. # 41 at 26.)

The Texas constitution provides that "[n]o bill of attainder, ex post

facto law, retroactive law, or any other law impairing the obligation of contracts

shall be made."  TEX. CONST. art. I, § 16.  "A retroactive law is one that extends to

matters that occurred in the past."  Tenet Hosps. Ltd. v. Rivera, 445 S.W.3d 698,

707 (Tex. 2014).[12]  The Texas Supreme Court announced a three-part test for

determining whether a retroactive law is unconstitutional, focusing on: (1) the

nature and strength of the public interest served by the statute; (2) the nature of the

prior right impaired by the statute; and (3) the extent of the impairment.  Robinson

v. Crown Cork & Seal Co., 335 S.W.3d 126, 145 (Tex. 2010).  For a plaintiff to

assert an unconstitutional retroactivity claim, the Court must determine that, in

accordance with prong (2) of the Robinson test, the plaintiff had a settled and

---

[12] The City argues that the STR Ordinance is not retroactive because it
*prospectively* limits Type 2 STRs to zoning districts where their use would be
compatible with surrounding uses.  (Dkt. # 66 at 13 (emphasis original).)  This
argument might be persuasive if the Andings purchased their home after the
enactment of the STR Ordinance, but the Andings owned their home well before
the STR Ordinance was promulgated, and the law restricts a previously permitted
use of that property.  Thus, there is no denying that the STR Ordinance impacts the
Andings retroactively.  See Tenet Hosps., 445 S.W. at 707 (citing Landgraf v. USI
Film Prods., 511 U.S. 243, 270 (1994) (determining for the purposes of
retroactivity "whether the new provision attaches new legal consequences to events
completed before its enactment.").  But "not all retroactive statutes are
unconstitutional," and the Court's analysis therefore focuses on this issue.  Id.

reasonable expectation of a constitutional right.  See id. at 148; see also Union

Carbide Corp. v. Synatzske, 438 S.W.3d 39, 58 (Tex. 2014).

Because prong (2) requires the most in-depth discussion, the Court

reverses the order of the elements in the following analysis, starting with prongs

(1) and (3) before proceeding to prong (2).

a.  Nature and Strength of Public Interest

As noted above, the City does not contest the application of collateral

estoppel to the Andings' retroactivity claim.[13]  (Dkt. # 66 at 10.)  Thus, the City

cannot re-raise the same justifications proffered in Zaatari to support its contention

that non-occupying homeowners pose unique harms to neighborhoods and public

safety.[14]  And while the City is correct that Zaatari's retroactivity holding was

cabined to § 25-2-950, it skirts over the fact that § 25-2-950 not only established a

termination date for all existing Type-2 licenses, but also "immediately suspended

the licensing of any new type-2 short term rentals."  Zaatari, 615 S.W.3d at 181

(citing § 25-2-950).  Thus, the ambiguity in Zaatari's holding that this Court

previously identified remains.  (See Dkt. # 41 at 25 ("The court in Zaatari

---

[13] The City does seem to make an argument contradicting this concession, which is that this Court cannot take judicial notice of factual findings of another court, but this rule does not apply to collateral estoppel.  See Nairn v. Killeen Indep. Sch. Dist., 366 S.W.3d 229 (Tex. App. – El Paso, Feb. 22, 2012).

[14] However, even if it could, this Court has independently reviewed the evidence and comes to the same conclusion as the court in Zaatari.

concluded that 'owners of type-2 rental properties have a settled interest in their right to lease their property short term.'  But nothing in the decision clearly indicates whether the court viewed 'owners of type-2 rental properties' as those who already had a license, or merely those who owned properties subject to Type 2 regulations, whether licensed or not.") (citations omitted).)

Regardless, as to the issue of the nature and strength of the public interest in the STR's homestead requirement, the City is collaterally estopped from relitigating.  As the Court noted earlier, <u>Zaatari</u> reviewed the same justifications as the City raises here and made the broad holding that "nothing in the record supports a conclusion that a ban on type-2 rentals would resolve or prevent the stated concerns."  615 S.W.3d at 189.  The court's holding that "the City's purported public interest for banning type-2 rentals is slight" therefore applies.  <u>Id.</u>

b. <u>Extent of Impairment</u>

<u>Zaatari</u>'s holding likewise dictates the outcome of the third prong of the unconstitutional retroactivity test.  "The effect of the ordinance on the property right at issue here is clear – the City's ordinance eliminates the right to rent property short term if the property owner does not occupy the property.  The elimination of a right plainly has a significant impact on that right."  <u>Id.</u> at 191.  Because the STR Ordinance continues to eliminate the right to rent property short

term if the property owner does not occupy the property, there is no disputing that the extent of the impairment is "significant."  Id.

      c.  Settled and Reasonable Expectations

          In Zaatari, after describing the long and historic practice of short-term rentals in Austin, the court concluded that "owners of type-2 rental properties have a settled interest in their right to lease property short term."  Id.  As this Court noted in the February Order, Zaatari is silent as to whether its findings apply only to existing Type 2 license holders or more broadly to owners of homes that constitute Type 2 properties, licensed or not.  (Dkt. # 41 at 27.)  However, despite this ambiguity, Zaatari appears to opine on the expectation for short-term rentals in Austin generally, stating that "Austinites have long exercised their right to lease their property by housing short-term tenants . . . the record establishes[] that short-term rentals are an 'established practice' and a 'historically . . . allowable use'." Zaatari, 615 S.W.3d at 191. While the City may be correct that "[w]hen [the Andings] bought their Austin home in 2014, they were on notice that the City regulated STRs and their location," there is a difference between knowing that the City requires a permit for short-term renting and having notice that the City may altogether eliminate the "historically . . . allowable use" of residential STRs.  (Dkt. # 66 at 15.); Zaatari, 615 S.W.3d at 191.

27

Moreover, the Eastern District of Texas, relying on Zaatari, found that a property owner company in McKinney, Texas had a reasonable and settled expectation to use its property as a concrete batch plant. TXI Operations, LP v. City of McKinney, Texas, No. 4:20-CV-353, 2023 WL 161942, at *22 (E.D. Tex. Jan. 11, 2023). TXI is admittedly distinguishable in that the City of McKinney made no argument that the plaintiffs had no reasonable or settled expectations, as the City of Austin does here. Id.; see also City of Grapevine v. Muns, 641 S.W.3d 317, 345 (Tex. App. – Fort Worth 2021, pet. denied) ("Because the Homeowners' retroactivity claim hinges on settled rather than vested rights and the City has not argued that the Homeowners' pleaded rights are not settled, we conclude that the Homeowners have pleaded a facially valid retroactivity claim."). But, as relevant here, the court still reasoned that "the City's rezoning and amortization of TXI's property has the same effect as the retroactive ordinances in Zaatari and Muns – the elimination of well-established and settled property rights that existed before the laws were enacted." Id. The court then drew another parallel to Zaatari, stating that "[a]s in Zaatari, the record establishes that TXI spent a significant amount of time and money investing in its property for the purpose of using it as a concrete batch plant, a use that was lawful when TXI invested its time and money. Additionally, TXI's expectations directly touch on its real property rights as a private property owner." Id.

28

With <u>Zaatari</u> and the Eastern District of Texas's subsequent interpretation of it in mind, the Court likewise concludes that the Andings had a settled and reasonable expectation of a right to rent their property for short-terms when they purchased it in 2014.  On balance, "the ordinance serves a minimal, if any, public interest while having a significant impact on property owners' substantial interest in a well-recognized property right."  <u>Zaatari</u>, 615 S.W.3d at 191.  Thus, the Court holds that the imposition of a homestead requirement for individuals who owned a Type 2 property prior to the 2016 revision of the STR Ordinance is unconstitutionally retroactive.

IV.    <u>Equal Protection Claims</u>

The Court agrees with the City that the Andings are prohibited from re-raising their state and federal equal protection claims after the Court's dismissal of them on February 16, 2023.  (Dkt. # 41 at 28-31.)  Regardless, the Andings have proffered no arguments in support of their equal protection claims either in their Motion for Summary Judgment or in their Responses.  The Court therefore understands the re-raising of these claims in the SAC to have been an oversight rather than an attempt to proffer them without first requesting leave of the Court. The Andings' state and federal equal protection claims remain dismissed.

V.    <u>Substantive Due Process</u>

Finally, the Court will also consider the Andings' substantive due process claims.[15]  As before, the central debate between the Andings and the City is whether the right to rent residential properties short-term is a vested constitutional right giving rise to a substantive due process guarantee. Accordingly, the Court reiterates the applicable federal and Texas legal standards.

The Fourteenth Amendment of the U.S. Constitution guarantees that individuals shall not be deprived of their property without due process of law.  U.S. CONST. amend. XIV, § 1.  To raise a federal substantive due process claim, a plaintiff must establish that she holds a constitutionally protected property right. See Simi Inv. Co., Inc. v. Harris Cty., Tex., 236 F.3d 240, 249 (5th Cir. 2000); see also Brennan v. Stewart, 834 F.2d 1248, 1257 (5th Cir. 1988) ("A violation of substantive due process, for example, occurs only . . . when the government works a deprivation of a constitutionally protected interest.").  The nature of a property interest must be determined by state law.  Simi, 236 F.3d at 250; see also Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1046 (5th Cir. 1998) ("In order to assert a violation of [the Fourteenth Amendment], one must at least demonstrate the deprivation of a protected property interest established through some independent source such as state law.").

---

[15] The Andings advance a federal due process and state due course of law claim, but Texas courts have stated that there is no meaningful distinction between the two.  Univ. of Tex. Med. Sch. at Hous. v. Than, 901 S.W.2d 926, 929 (Tex. 1995).

Texas law instructs that for a due process property right to be constitutionally protected, it must be vested.[16] Klumb v. Hous. Mun. Emp. Sys., 458 S.W.3d 1, 15 (Tex. 2015). A right is "vested" when it "has some definitive, rather than merely potential existence." Consumer Serv. All. of Tex., Inc. v. City of Dall., 433 S.W.3d 796, 805 (Tex. App. – Dallas 2014) (quoting City of Hous. v. Guthrie, 332 S.W.3d 578, 597 (Tex. App. – Houston [1st Dist.] 2009, pet. denied)). Private property ownership is a fundamental right. Zaatari, 615 S.W.3d at 190. The ability to lease property is a fundamental *privilege* of property ownership. Id. (emphasis added). But property owners do not have a constitutionally protected, vested right to use property in any certain way, without restriction. Consumer Serv. All., 433 S.W.3d at 805 (citing Morrow v. Truckload Fireworks, Inc., 230 S.W.3d 232, 238, 240 (Tex. App. – Eastland 2007, pet. dism'd)). Thus, the right to lease property for a profit – such as using it for STR rentals – can be subject to restriction or regulation under certain circumstances. Zaatari, 615 S.W.3d at 191. For example, Texas courts have found no vested right in property uses once commenced, in operating particular types of businesses on a property, or in zoning

---

[16] Not to be confused with the standard described earlier in this Order for a state retroactivity claim, which asks whether the right is "reasonable and settled." Robinson, 335 S.W.3d at 139. For instance, Zaatari found that owners of Type 2 rental properties do have a *settled* property right to lease property for short terms, but this determination was unrelated to the issue of whether the owners have a vested right to use their property for particular purposes. 615 S.W.3d at 191.

classifications.  See, e.g., City of Univ. Park v. Benners, 485 S.W.2d 773, 778

(Tex. 1972); Hang On III, Inc. v. Gregg Cty., 893 S.W.2d 724, 726 (Tex. App. –

Texarkana 1995, writ dism'd by agr.); Weatherford v. City of San Marcos, 157

S.W.3d 473, 483 (Tex. App. – Austin 2004, pet. denied).

   In the Court's previous discussion of the Andings' due process claims,

Muns played a central role.  (Dkt. # 41 at 33.)  In June of this year, the Texas

Supreme Court denied the parties' petition for review in Muns, with Justices

Young and Blacklock reasoning in their concurrences that waiting for another case

with fewer anterior questions distracting from the key constitutional issues would

"provide more time for other lower courts to opine on the issue" and "allow

advocates and scholars to more fully develop the original – and perhaps distinct –

meaning of the Takings and Due Course of Law Clauses of the Texas

Constitution."  City of Grapevine v. Muns, No. 22-0044, 2023 WL 4035802, at *2

(Tex. 2023).  Thus, the holding and reasoning of Muns as analyzed in the Court's

February Order remains instructive.

   As articulated in the February Order, in Muns, the issue was whether

an STR ordinance similar to the one in Austin took away the plaintiff's right to

lease their property on a short-term basis.  651 S.W.3d at 343.  The court of

appeals determined that private-property ownership is a fundamental right that

embraces such "essential attributes" as "the right to use, lease[], and dispose of it

for lawful purposes." Id. at 338-39 (quoting Terrace v. Thompson, 263 U.S. 197,

215 (1923)).  Ultimately, the Muns court concluded that the nature of real-property

rights in Texas gives rise a vested right to lease one's property sufficient to support

a due-course-of-law claim.  Id. at 346-47 (citing Vill. of Tiki Island v. Ronquille,

463 S.W.3d 562, 587 (Tex. App. – Houston 2015) (recognizing a narrow vested

right in the particular use of property when a new law restricts an *existing*

commercial use of a property)).

   This Court already found Muns distinguishable from the instant case

because (1) the plaintiffs in Muns had been leasing their homes as STRs for years –

they were not waiting for a license like the Andings, nor had an STR permit ever

been required in the city and (2) the ordinance in Muns banned *all* STRs, not just

those owned by out-of-state occupants.  Id. at 325-28.  Moreover, the due process

holding in Muns was cabined to the conclusion that "a property owner has a vested

right to lease his property.  Whether the durational restrictions imposed by the STR

Ordinance violate the Homeowners' due-course-of-law rights regarding their right

to lease goes to the case's merits, an altogether improper inquiry at this stage of the

case."  Id. at 347.

   The undersigned also previously considered TXI, a case involving a

new zoning plan to accommodate the City of McKinney's rapid growth.  2023 WL

161942, at *1.  The ordinance at issue in TXI rezoned the land on which the

33

plaintiff company's property was located, resulting in the amortization of the property for nonconforming use with the zoning plan. Id. at *2-*3. The court expressly stated that, as to a property interest for due process, the plaintiff only had a protected property interest based on its certificate of occupancy. Id. at *24. The court reasoned that the City of McKinney approved the plaintiff's site plan and granted a certificate of occupancy, only to later revoke it. Id. (citing House of Tobacco, Inc. v. Calert, 394 S.W.2d 654, 657 (Tex. 1965) (holding that license to wholesale cigarettes was a privilege without property interest, but once granted, could not be taken away except for good cause)). Ultimately, the court concluded that "if there was no certificate, there would be no protected property interest." Id.

With this background in mind, this Court already determined that even accepting the Andings' contention that Muns controls and they have a vested property right to lease, Texas law still maintains that property owners do not have a vested right to lease their property for profit in any certain way, without restriction. Consumer Serv. All., 433 S.W.3d at 805 (citing Morrow v. Truckload Fireworks, Inc., 230 S.W.3d 232, 238, 240 (Tex. App. – Eastland 2007, pet. dism'd)); Zaatari, 615 S.W.3d at 191 (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435-36 (1982) (granting that the right to lease property for profit can be subject to restriction or regulation under certain circumstances)). This Court also noted that unlike the prevailing plaintiff in Vill. of Tiki Island, the Andings never

had an STR license or "more than a unilateral expectation" of receiving one that might give rise to a clearly protected interest.  Id. at *24 (citing Shrieve v. Tex. Parks & Wildlife Dep't, No. 03-04-00640-CV, 2005 WL 1034086, at *5-6 (Tex. App. – Austin 2005, no pet.) (mem. op.) (holding that Shrieve's expectation of a permit was not a protected property interest)).

   This Court ultimately declined to reach the merits of the claims because the Andings alleged enough facts to state a claim at the motion to dismiss stage.  Now at summary judgment, the Court similarly opts to leave this issue untouched.  To reiterate, in denying the petition for review in Muns, Justices Young and Blacklock underscored the importance of providing "more time for other lower courts to opine on the issue" and allowing advocates and scholars additional opportunity to "more fully develop the original—and perhaps distinct— meaning of the Takings and Due Course of Law Clauses of the Texas Constitution."  2023 WL 4035802, at *2.  Until then, the Justices warned that review by the Texas Supreme Court may not permit "meaningful and reliable guidance to the many stakeholders who hold fervent positions on the legality of and wisdom behind short-term rental bans."  Id.

   Given that the Texas Supreme Court recently had the opportunity to weigh in on this issue and declined to do so, instead urging that lower state courts, scholars, and other stakeholders engage in further discourse, it is not the place of

this Court to supersede.  See R.R. Comm'n v. Pullman Co., 312 U.S. 496, 501-02

(1941); Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm., of

State Bar of Tex., 283 F.3d 650, 653 (5th Cir. 2002) (nothing that Pullman

abstention is appropriate when a case (1) involves a federal constitutional

challenge to a state action and (2) an unclear issue of state law that, if resolved,

would make a ruling on the federal constitutional question unnecessary).  This

Court has already invalidated the homestead requirement as violating the dormant

Commerce Clause and as unconstitutionally retroactive, rendering a third ruling on

due process unnecessary.  In light of this as well as the principles of Pullman

abstention, the Court declines to rule on the merits of the Andings' due process

claims.

<u>CONCLUSION</u>

Accordingly, the Court **DENIES** the City's Motion for Summary

Judgment (Dkt. # 66) and **GRANTS** the Andings' Motion for Summary

Judgment.  (Dkt. # 67.)  The Clerk's Office is instructed to **CLOSE THE CASE**.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 1, 2023.

_____
David Alan Ezra
Senior U.S. District Judge